1

2

3

4

5

6

7

8        IN THE UNITED STATES DISTRICT COURT

9        FOR THE EASTERN DISTRICT OF CALIFORNIA

10  WILLIE B. PENILTON,

11        Petitioner,              No. CIV S-06-1547 LKK CHS P

12     vs.

13  JEANNE WOODFORD, Warden,

14        Respondent.         FINDINGS AND RECOMMENDATIONS

15  _____/

16  I.     INTRODUCTION

17        Petitioner Willie Penilton is a state prisoner proceeding pro se with a petition for

18  writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Mr. Penilton attacks his conviction in the

19  Sacramento County Superior Court, case no. 03F06117, entered on November 21, 2003.

20  II.    CLAIMS

21        Mr. Penilton makes the following claims:

22     A.     The prosecutor engaged in vindictive prosecution;

23     B.     The prosecutor withheld evidence;

24     C.     The prosecutor violated Mr. Penilton's right to a speedy trial;

25     D.     The prosecutor intimidated witnesses;

26

1

E.      The prosecutor influenced testimony;

F.      Lack of access to legal material;

G.      The trial court failed to grant a continuance;

H.      Destruction of evidence;

I.      Jury Instruction Error;

J.      Mr. Penilton recieved ineffective assistance of appellate counsel; and

K.      Mr. Penilton's probation report was fabricated.

Upon careful consideration of the record and the applicable law, the undersigned will recommend that Mr. Penilton's petition for habeas corpus relief be denied.

III.    FACTUAL AND PROCEDURAL BACKGROUND

A.      Commitment Offense

Prosecution case-in-chief

In early July 2003, J.J. lived with her sister in Sacramento. Defendant also stayed there.

In July 2003, J.J. went to the U.C. Davis Medical Center with a broken jaw. She told a nurse that her boyfriend had punched her in the jaw three days previously. She told a Sacramento police officer that she had hung up on her boyfriend, Will, during a telephone call. Then he came to the house, said he was going to kill her, and choked her until she was unconscious. He subsequently punched her in the jaw to wake her up. She went to the hospital a few days later because her jaw still hurt.

After J.J. was released from the hospital, her sister obtained a restraining order to remove J.J. from the residence. J.J. then went to live with defendant and his uncle at a motel on Stockton Boulevard.

Ten days after her prior visit, J.J. returned to the medical center because her jaw had been broken again. She told a Sacramento police officer that two nights previously, defendant had hit her on the side of her head with his open hand, causing her to fall and hit her head on the bathtub. He continued to hit her and again broke her jaw. Then he choked her until she lost consciousness. Defendant, who was in the medical center waiting room, was detained and later arrested. After being advised of and waiving his rights, defendant said he did not know how J.J. had first hurt her jaw.

2

J.J. initially testified at trial that she could not remember how she had been injured because she had been drinking and taking drugs. She said friends had told her that defendant had hit her. She thought defendant had broken her jaw the first time because he was on top of her when she regained consciousness. She admitted that she was violent at times. She had suffered convictions for prostitution and receiving stolen property. She testified on direct examination that she was in love with defendant. However, on cross-examination by defendant in propria persona, she testified that she was not in love with him.[FN1]

FN1. Defendant had appeared in propria persona on several occasions prior to this case.

When she was recalled two days later, J.J. testified that she had agreed to testify that she did not remember what had happened to her. In one of 40 to 50 letters defendant had sent her, he admonished her, "whatever you do, don't flip the script...." He told her to "follow his leads" when he cross-examined her. But when he tried during trial to make it appear that she was lying, she became concerned that the prosecutor would file a perjury charge against her. She then testified that defendant had strangled, hit and threatened her. On cross-examination, she told defendant that when she first testified, she "wanted [him] to be out" of custody and she "tried to change [her] story to help [him] out." She insisted that defendant had hit and strangled her. When he asked, "So you feel I was trying to have you lie yesterday?" she replied, "Yeah. It's in the letters, Willie."

Defense

Defendant testified that he had prior convictions for car theft, second-degree burglary, and attempted kidnapping with the use of a gun. Defendant testified that he did not hit J.J., although she repeatedly told him that he had. On July 15, she cut the wires holding her jaw shut because she was hungry.

On cross-examination, an employee of the Budget Inn acknowledged having heard J.J. yelling at defendant that he had broken her jaw.

/////

November 9, 2005 opinion of the California Court of Appeal, Third Appellate District, case no. C046462, 2005 WL 3032639, *1-2.

On October 20, 2003 a jury found Mr. Penilton guilty of inflicting corporal injury on a spouse with great bodily injury, battery with serious injury, and two counts of simple assault. CT at 457-461. On February 27, 2004 the trial judge sentenced him to 18 years in

3

1  prison.  CT at 10.

2       B.      State Appellate Proceedings

3              After receiving his sentence Mr. Penilton filed an appeal with the California

4  Court of Appeal.  On November 9, 2005 that court affirmed Mr. Penilton's conviction and

5  sentence.  On December 15, 2005 Mr. Penilton filed a petition for review with the California

6  Supreme Court.  Answer, Ex. 5.  That petition was denied on January 18, 2006.

7       C.      State Habeas Corpus Proceedings

8              While his appeal was still pending, Mr. Penilton filed a petition for writ of habeas

9  corpus in the Sacramento County Superior Court.  That petition was denied on March 7, 2005.

10  On March 21, 2005 Mr. Penilton filed a habeas petition in the California Court of Appeal.  That

11  petition was denied on March 24, 2005.  Answer, Ex. 9 at 2.  On June 1, 2005, he filed a habeas

12  petition with the California Supreme Court.  Answer, Ex. 10.  That petition was denied on May

13  17, 2006.

14              On January 24, 2006 Mr. Penilton filed a petition for review in the California

15  Supreme Court.  That petition was denied on May 7, 2006.  Mr. Penilton also filed a petition for

16  review in the Sacramento County Superior Court on January 27, 2006.  Answer, Ex. 11.  That

17  petition was denied on April 17, 2006.  Answer Ex. 11 at 3.

18              Mr. Penilton then filed another petition in the California Court of Appeal on May

19  10, 2006.  Answer, Ex 12.  That petition was denied on May 18, 2006.  Mr. Penilton filed

20  another petition with the California Supreme Court on June 2, 2006, which was denied on

21  January 17, 2007.  Answer, Ex. 13.  Mr. Penilton finally filed this federal petition on July 12,

22  2006 and an amended petition on April 9, 2007.

23  IV.    APPLICABLE STANDARD OF HABEAS CORPUS REVIEW

24              A writ of habeas corpus is available under 28 U.S.C. § 2254 only on the basis of

25  some transgression of federal law binding on the state courts.  See Peltier v. Wright, 15 F.3d 860,

26                                        4

861 (9th Cir. 1993); Middleton v. Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985) (citing Engle v. Isaac, 456 U.S. 107, 119 (1982)).  A federal writ is not available for alleged error in the interpretation or application of state law.  See Estelle v. McGuire, 502 U.S. 62, 67-68 (1991); Park v. California, 202 F.3d 1146, 1149 (9th Cir. 2000); Middleton, 768 F.2d at 1085.  Habeas corpus cannot be utilized to try state issues de novo.  Milton v. Wainwright, 407 U.S. 371, 377 (1972).

This action is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  See Lindh v. Murphy, 521 U.S. 320, 336 (1997); Clark v. Murphy, 331 F.3d 1062, 1067 (9th Cir. 2003).  Section 2254(d) sets forth the following standards for granting habeas corpus relief:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  See also Penry v. Johnson, 532 U.S. 782, 792-93 (2001); Williams v. Taylor, 529 U.S. 362 (2000); Lockhart v. Terhune, 250 F.3d 1223, 1229 (9th Cir. 2001).  The court looks to the last reasoned state court decision as the basis for the state court judgment. Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004).

/////

V.     PETITIONER'S CLAIMS[1]

      A.     Vindictive Prosecution

           1)     Description of Claim

           Mr. Penilton claims his conviction was the result of vindictive prosecution. Petition at 23.  Specifically he claims that the prosecutor committed prosecutorial misconduct by charging him with two counts of attempted murder.  Id.   He argues that the prosecution had no evidence to support these charges and that the victim's testimony refuted them.  Id.6 at 26-29.

           2)     Applicable Law

           "In our system, so long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file ... generally rests entirely in his discretion."  Bordenkircher v. Hayes, 434 U.S. 357, 364 (1978).  " '[T]he conscious exercise of some selectivity in enforcement is not in itself a federal constitutional violation' so long as 'the selection was not deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification.' "  Id. (quoting Oyler v. Boles, 368 U.S. 448, 456 (1962)) (alteration in the original).

           Such discretion is not however without limitations.  The Supreme Court prohibits punishing "a person because he has done what the law plainly allows him to do."  United States v. Goodwin, 457 U.S. 368, 372 (1982) (internal quotation marks and citation omitted), though the Court demands "exceptionally clear proof" before inferring an abuse of prosecutorial discretion.  McCleskey v. Kemp, 481 U.S. 279, 297 (1987).  Specifically,  a "prosecutor violates

---

[1] Respondent argues that two of Mr. Penilton's claims are procedurally defaulted.  A reviewing court need not invariably resolve the question of procedural default prior to ruling on the merits of a claim where the issue of procedural default turns on difficult questions of state law.  Lambrix v. Singletary, 520 U.S. 518, 524-25 (1997); see also Busby v. Dretke, 359 F.3d 708, 720 (5th Cir. 2004).  Under the circumstances presented here Mr. Penilton's claims can be resolved more easily by addressing them on their merits.  Accordingly, this report will assume that petitioner's claims are not procedurally defaulted.

due process when he seeks additional charges solely to punish a defendant for exercising a constitutional or statutory right."  United States v. Hernandez-Herrera, 273 F.3d 1213, 1217 (9th Cir. 2001) (citation omitted).

Nevertheless, "[o]rdinarily, [courts] presume that public officials have properly discharged their official duties."  Banks v. Dretke, 540 U.S. 668, 696 (2004) (citations omitted). Therefore where a defendant claims that a prosecutor's charging decision was based on a violation of the Constitution, the defendant's "standard [of proof] is a demanding one."  United States v. Armstrong, 517 U.S. 456, 463 (1996).

"To establish a prima facie case of prosecutorial vindictiveness, a defendant must show either direct evidence of actual vindictiveness or facts that warrant an appearance of such." United States v. Montoya, 45 F.3d 1286, 1299 (9th Cir. 1995) (internal quotation marks and citation omitted); see Goodwin, 457 U.S. at 380 n. 12 (suggesting that "a defendant might prove through objective evidence an improper prosecutorial motive" in order to establish a prosecutorial vindictiveness claim);  Blackledge v. Perry, 417 U.S. 21, 27-29 (1974) (holding that vindictiveness could be presumed when prosecutor brings additional charges after defendant appeals his conviction).  If the defendant provides "[e]vidence indicating a realistic or reasonable likelihood of vindictiveness" this "give[s] rise to a presumption of vindictiveness on the government's part."  United States v. Garza-Juarez, 992 F.2d 896, 906 (9th Cir. 1993) (citation omitted); see Blackledge, 417 U.S. at 27.

The burden then shifts to the prosecution to show that " 'independent reasons or intervening circumstances dispel the appearance of vindictiveness and justify its decisions.' " Montoya, 45 F.3d at 1299 (quoting United States v. Hooton, 662 F.2d 628, 633 (9th Cir. 1981)); see Goodwin, 457 U.S. at 374 (suggesting that a presumption of vindictiveness "may be overcome only by objective information in the record justifying" an official's conduct).

/////

7

3)   <u>Discussion</u>

While Mr. Penilton gives a detailed recount of the facts his sole argument appears to be that the prosecution had "no proof of any attempted murders" to support the charges. Petition at 26.  Even if that claim were true, Mr. Penilton has not attempted to show "either direct evidence of actual vindictiveness or facts that warrant an appearance of such."  <u>Montoya</u>, 45 F.3d at 1299.  Further, review of the record finds ample support for these charges.

At the preliminary hearing an officer testified that the victim stated that during the July 3 assault Mr. Penilton choked her to the point she lost consciousness and required CPR.  CT at 159-160.  According to the victim, Mr. Penilton claimed he killed her and brought her back to life.  <u>Id.</u> at 160.  The officer further testified that the victim informed him that Mr. Penilton also choked her to the point she lost consciousness during the July 14 assault.  CT at 171.

On direct examination after being recalled the victim testified that on July 3 Mr. Penilton choked her until she lost consciousness.  RT at 429.  After the victim regained consciousness, Mr. Penilton again choked her until she lost consciousness.  <u>Id.</u>  During the incident Mr. Penilton told the victim "you're gonna die."  <u>Id.</u> at 429-30.  The victim described the July 14 assault as occurring in a similar manner with Mr. Penilton choking the victim to the point she lost consciousness and proclaiming that he would kill her.  <u>Id.</u> at 432-33.

Mr. Penilton does provide numerous examples of the victim's lack of credibility and inconsistent statements.  Those examples undoubtedly played some role in jury's not guilty verdict as to these counts.  Nevertheless, even with the victim's apparent lack of credibility, the prosecution had sufficient evidence to support these charges and Mr. Penilton has not provided any evidence that would give rise to a presumption of vindictiveness.  Mr. Penilton is therefore not entitled to relief on this claim.

/////

/////

B.      Prosecutor Withheld Evidence

        1)      Description of Claim

        Mr. Penilton claims that the prosecutor violated her duty to disclose evidence. Petition at 30.  Specifically, Mr. Penilton claims the prosecution refused to disclose the victim's "rap sheet" which noted convictions for crimes of moral turpitude.  Id.

        2)      Applicable Law

        The United States Supreme Court has held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  Brady v. Maryland, 373 U.S. 83, 87 (1963).  See also Bailey v. Rae, 339 F.3d 1107, 1113 (9th Cir. 2003).  The duty to disclose such evidence is applicable even though there has been no request by the accused, United States v. Agurs, 427 U.S. 97, 107 (1976), and encompasses impeachment evidence as well as exculpatory evidence.  United States v. Bagley, 473 U.S. 667, 676 (1985).  A Brady violation may also occur when the government fails to turn over evidence that is "known only to police investigators and not to the prosecutor." Youngblood v. West Virginia, 547 U.S.867,870 (2006) ("[T]he individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police") (quoting Kyles v. Whitley, 514 U.S. 419, 438 (1995).  There are three components of a Brady violation:  "[t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; the evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." Strickler v. Greene, 527 U.S. 263, 281-82 (1999).  See also Banks v. Dretke, 540 U.S. 668, 691 (2004); Silva v. Brown, 416 F.3d 980, 985 (9th Cir. 2005).

        In order to establish prejudice, a petitioner must demonstrate that "'there is a reasonable probability' that the result of the trial would have been different if the suppressed

1    documents had been disclosed to the defense." <u>Strickler</u>, 527 U.S. at 289.  "The question is not

2    whether petitioner would more likely than not have received a different verdict with the

3    evidence, but whether "in its absence he received a fair trial, understood as a trial resulting in a

4    verdict worthy of confidence."  (<u>Id.</u>) (quoting <u>Kyles</u>, 514 U.S. at 434).  <u>See</u> <u>also</u> <u>Silva</u>, 416 F.3d

5    at 986 ("[A] <u>Brady</u> violation is established where 'the favorable evidence could reasonably be

6    taken to put the whole case in such a different light as to undermine confidence in the verdict.'")

7    Once the materiality of the suppressed evidence is established, no further harmless error analysis

8    is required.  <u>Kyles</u>, 514 U.S. at 435-36; <u>Silva</u>, 416 F.3d at 986.  "When the government has

9    suppressed material evidence favorable to the defendant, the conviction must be set aside."

10   <u>Silva,</u> 416 F.3d at 986.

11             3)    <u>Discussion</u>

12             Mr. Penilton argues that he requested the victim's Nevada criminal record, or "rap

13   sheet."  Petition at 30.  He claims the prosecutor only allowed the trial judge to view the record

14   and that the trial judge only provided him with a "cut up copy."  <u>Id.</u>  at 30-31.  Mr. Penilton

15   believes the rap sheet would have shown that the victim had a prior conviction in Las Vegas for

16   prostitution.  <u>Id.</u> at 30-31.  The refusal to disclose this evidence, he argues, proves that the

17   prosecution engaged in "misconduct," destroyed evidence and was "setting [him] up."  <u>Id.</u> at 31-

18   32.

19             Even if Mr. Penilton's allegations were true, i.e. that the prosecution willfully

20   withheld this evidence, he cannot establish any prejudice.  At trial, the victim testified on direct

21   examination by the prosecutor that she had been previously convicted of receiving stolen

22   property, welfare fraud, and for prostitution in Sacramento County.  RT at 216.  The victim also

23   testified that she had been convicted of prostitution in Las Vegas.  <u>Id.</u>   On cross examination

24   the victim testified that she had four or five convictions for prostitution in Las Vegas.  <u>Id.</u> at 218.

25   The victim's credibility was therefore impeached with the exact information, and in the exact

26

1  manner, as Mr. Penilton wished.

2       Regardless of whether Mr. Penilton was given a copy of the victim's rap sheet the

3  impeachment evidence he desired was presented to the jury.  It is not reasonably probable that

4  the jury would have reached another verdict if he had been given a physical copy of the rap

5  sheet.  Mr. Penilton is therefore not entitled to relief on this claim.

6       C.       Violation of Right to Speedy Trial[2]

7            1)       Description of Claim

8            Mr. Penilton claims the prosecution violated his right to a speedy trial.  Petition

9  at 35.  Mr. Penilton claims that on August 8, 2003 he requested a "fast and speedy trial" but that

10  his trial did not begin until October 1, 2003 because the prosecution filed "false documents."  Id.

11  at 35-36.

12            2)       Applicable Law

13            The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused

14  shall enjoy the right to a speedy and public trial . . ."  U.S. Const., Amend. VI.  In assessing a

15  speedy trial claim, the court must weigh four factors: "whether delay before trial was

16  uncommonly long, whether the government or the criminal defendant is more to blame for that

17  delay, whether, in due course, the defendant asserted his right to a speedy trial, and whether he

18  suffered prejudice as the delay's result."   Doggett v. United States, 505 U.S. 647, 651 (1992)

19  (citing Barker v. Wingo, 407 U.S. 514, 530 (1972)).  See also McNeely v. Blanas, 336 F.3d 822,

20  826 (9th Cir. 2003); United States v. Valentine, 783 F.2d 1413, 1417 (9th Cir. 1986).  No one of

21  these four factors alone is either a necessary or sufficient to support a finding that there has been

22  a deprivation of the constitutional right to a speedy trial.  McNeely, 336 F.3d at 826.  Rather, the

23  various factors are related and must be considered together.  Barker, 407 U.S. at 533.  However,

24  _____

25       [2] Petitioner's claims 3, 4, 5 and 6 are nearly identical and will therefore be combined into
one claim.

26

"no showing of prejudice is required when the delay is great and attributable to the government." United States v. Shell, 974 F.2d 1035, 1036 (9th Cir. 1992).  See also Doggett, 505 U.S. at 651 (eight and one-half year delay between indictment and trial, six of which were attributable to the government's negligence, violated a defendant's constitutional right to a speedy trial even though he could not demonstrate the delay impaired his ability to mount a successful defense).

The Supreme Court has observed that:

> The length of the delay is to some extent a triggering mechanism. Until there is some delay which is presumptively prejudicial, there is no necessity for inquiry into the other factors that go into the balance. Nevertheless, because of the imprecision of the right to speedy trial, the length of delay that will provoke such an inquiry is necessarily dependent upon the peculiar circumstances of the case.

Barker, 407 U.S. at 530.  In this regard, depending on the nature of the charges, courts have generally found post-accusation delay "presumptively prejudicial" when it begins to approach one year.  Doggett, 505 U.S. at 652, n.1; see also McNeely, 336 F.3d at 826 (three-year delay was presumptively prejudicial); United States v. Gregory, 322 F.3d 1157, 1162 (9th Cir. 2003) (22-month delay between first superseding indictment and trial date was presumptively prejudicial but did not weigh heavily in defendant's favor because it was not excessively long); United States v. Aguirre, 994 F.2d 1454, 1457 (1993) (finding that "a five year delay is long enough to trigger a further look," but concluding that even the five-year delay in that case did not deprive the defendant of his constitutional right to a speedy trial when all the Barker v. Wingo factors were balanced).

3)   Discussion

Mr. Penilton's first appearance before a judge in this matter occurred on July 18, 2003.  CT at 1.  Mr. Penilton's jury trial commenced on October 1, 2003.  CT at 249.  Thus less than 90 days elapsed between his first appearance and the beginning of his trial.  Mr. Penilton does not argue that he suffered any prejudice to his defense during this period, but merely that

12

1  his right to a speedy trial was violated.

2  A "delay" of such a short amount of time cannot be said to have violated Mr.

3  Penilton's right to a speedy trial, particularly absent any showing of prejudice.  See U.S. v.

4  Martin, 587 F.2d 31, 33 (9th Cir. 1978) (finding that a six month delay did not violate

5  defendant's right to speedy trial.)  Mr. Penilton is therefore not entitled to relief on this claim.

6  D.  Witness Intimidation[3]

7  1)  Description of Claim

8  Mr. Penilton claims the prosecutor intentionally fabricated documents showing

9  that defense witnesses had outstanding warrants or had suffered criminal convictions.  Petition at

10  41.  Mr. Penilton claims the prosecutor intended to intimidate these witnesses to prevent their

11  testifying on his behalf.  Id.

12  2)  Applicable Law

13  It is well established that "substantial government interference with a defense

14  witness's free and unhampered choice to testify amounts to a violation of due process."  United

15  States v. Little, 753 F.2d 1420, 1438 (9th Cir. 1984).  Nevertheless, "[a] defendant's

16  constitutional rights are implicated only where the prosecutor or trial judge employs coercive or

17  intimidating language or tactics that substantially interfere with a defense witness' decision

18  whether to testify."  U.S. v. Vavages, 151 F.3d 1185, 1189 -1190 (9th Cir. 1998); see also United

19  States v. Davis, 974 F.2d 182, 187 (D.C. Cir. 1992) ("[A defendant's] rights are not trenched

20  upon by mere information or advice about the possibility of a perjury prosecution, but by

21  deliberate and badgering threats designed to quash significant testimony.")

22  3)  Discussion

23  On October 6, 2003 the prosecutor gave Mr. Penilton a document listing the

24  _____

25  [3] Petitioner's claims 7, 8 and 9 are nearly identical and will therefore be combined into one claim.

26  13

names and dates of birth of his witnesses, along with any indication that they had criminal

convictions or outstanding warrants.  CT at 662.  Thereafter two of the three testified in Mr.

Penilton's defense.[4]

On direct examination of Mary Richardson, Mr. Penilton asked her if she had an

outstanding warrant.  RT at 453.  She answered that she did not.  <u>Id.</u>  In responding to the

prosecutor's objection to the question, Mr. Penilton stated, "[i]t's relevant because all my

witnesses the D.A. put they got warrants or possible warrants, warrants or possible warrants."

<u>Id.</u>

On direct examination of Simon Lozano Mr. Penilton asked him to "tell the jury

all your convictions."  RT at 512.  Mr. Lozano answered that his convictions were "[m]ore or

less misdemeanors," that he had never been convicted of a felony, but that he was a "certified

severe alcoholic."  <u>Id.</u>  Mr. Penilton followed up by asking if Mr. Lozano had ever been

convicted of spousal abuse.  <u>Id.</u>  Mr. Lozano stated, "[n]o, I never have."  <u>Id.</u>

In a post trial hearing on Mr. Penilton's motion for a new trial he argued that he

should receive a new trial because the prosecutor "fabricated documents."  RT at 693.  In

response to this allegation the prosecutor stated that she had an investigator run the names and

dates of birth of defense witnesses through various criminal databases and then turned this

information over to Mr. Penilton as required by the discovery laws.  RT at 694-95.  The

prosecutor noted that she never impeached any of the defense witnesses with the information.

<u>Id.</u>

"Undue prosecutorial interference in a defense witness's decision to testify arises

when the prosecution intimidates or harasses the witness to discourage the witness from

testifying, for example, by threatening the witness with prosecution for perjury or other

_____

[4] There is no indication in the record as to why the third witness was not called to testify.
Mr. Penilton does not claim that it was a result of this issue.

offenses." <u>Williams v. Woodford</u> 384 F.3d 567, 601-02  (9th Cir. 2004) (citations omitted). "The prosecution's conduct must amount to a substantial interference with the defense witness's free and unhampered determination to testify before the conduct violates the defendant's right to due process." <u>Id.</u>

There is no evidence the prosecutor actions were intended to do anything more than comply with the applicable discovery obligations.  While it appears that some of information may not be accurate, that does not mean that the prosecutor fabricated the information or was wrong to include it in the disclosure.  In response to the disclosure Mr. Penilton's witnesses did not change their testimony or refuse to appear.  Further, it was Mr. Penilton, not the prosecutor, that introduced this information into evidence, effectively impeaching his own witnesses.  Mr. Penilton is not entitled to relief on this claim.

     E.     <u>Prosecutor Influenced Testimony</u>

     1)     <u>Description of Claim</u>

Mr. Penilton claims the prosecutor failed to disclose evidence that the victim was receiving compensation from a victim's fund.  Petition at 45.  He argues that the prosecutor "withheld this information with the sole intent to mislead the jury, court and defendant."  <u>Id.</u> at 46.  Mr. Penilton argues that the jury had "a right to know that the victim was going to be compensated for her testimony, upon defendant's conviction."  <u>Id.</u> at 47.

     2)     <u>Applicable Law And Discussion</u>

As previously noted, the United States Supreme Court has held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  <u>Brady</u>, 373 U.S. at 87.

Mr. Penilton raised this issue to the trial court at his judgement and sentencing. RT at 668, 701-20.  At that hearing the prosecution stated:

Your Honor, first of all, the victim in this case, Jamela Jennings, was always deemed a hostile witness towards the People. She was not cooperative with the People. She did not want to testify in this matter. And at one point she had a bench warrant issued for her.

There were no grants of immunity given to Miss Jamela Jennings nor were there any subversive offers of money should she testify for the prosecution in this case.

It's my recollection in this case that the victim had to be forced in here, even testified that she was in danger of getting another warrant for failing to comply with the D.A. subpoena, and that when she did testify on this matter, she testified for the defendant.

In terms of his issues of payoffs, I am not aware of any monies being turned over. I would be the one to approve monies for, let's say, a per diem or to approve a taxi ride or to approve any of those things. I am under the impression she was not paid a per diem because she really actually wasn't under subpoena. She basically was threatened to get a warrant should she not comply. I think she may have been given taxi rides here, but that I don't know.

I think what the defendant is talking about is the fact that she got referred to the California State Victims of Crime program. As a prosecutor, I have a duty to seek restitution for victims of crimes, and it's my obligation to, at a minimum, do the referral to the State Victims of Crime Board. That was done. That was done after Miss Jennings testified.

Miss Jennings was never offered anything because Miss Jennings didn't want anything from us. She wasn't talking to us. She wasn't cooperative with us. And by "us," I mean the prosecution.

It's also my understanding that she was referred to the board, the Victims of Crime Board program through the State of California, and that she had opened an account with them, or they opened an account for her, and that they were in fact investigating what happened here to decide whether they were going to give her any monies.

I know a letter was submitted to me asking whether I would approve giving her of (sic) money, and I denied it. So it's my understanding at this time that the account is open but pending, and there is a zero balance, which means she has been given no money by the State of California. Not the District Attorney's office. What we're talking about is the State of California.

So the defendant's allegations have absolutely no merit in terms of being given monies to testify or gifts of monies to testify or promises of monies to testify, and that never happened, and the People categorically deny it.

In terms of the State of California giving her money, it's my understanding that because the D.A. has not approved the State

16

of California giving her money, that they have not given her money.

RT at 702-04.

Additionally, in her February 20, 2004 opposition to Mr. Penilton's request for post-trial discovery, the prosecutor attached a printout supported by a sworn declaration showing that as of January 22, 2004, the victim had not received any money from the State Victims of Crime Program.  CT at 614-619.

The victim may have had some interaction with the State of California for the purpose of compensating her as a crime victim.  However, there is no evidence that the victim received any money before, during or after trial.  There is no evidence to support Mr. Penilton's claim that the victim was "compensated for her testimony, upon defendant's conviction" or that the prosecutor "withheld this information with the sole intent to mislead the jury, court and defendant."  It appears the victim was not compensated, there was no evidence for the prosecution to disclose, and Mr. Penilton is therefore not entitled to relief on this claim.

F.      Refusal to Grant Petitioner Access to Legal Material[5]

        1)      Description of Claim

Mr. Penilton argues that his right to access legal materials was violated during his trial.  Petition at 48.  Specifically Mr. Penilton argues the county jail failed to grant him appropriate access to the law library and that the trial judge refused to enforce his right.  Id. at 48-57.

        2)      Applicable Law And Discussion

The United States Supreme Court has held that the denial of access to a law library cannot provide the basis for federal habeas corpus relief because no Supreme Court case

---

[5] Mr. Penilton's claims 11 and 13 are largely identical and will therefore be addressed as one claim.

17

1   clearly establishes a pro se petitioner's constitutional right to law library access.  Kane v. Garcia

2   Espitia, 546 U.S. 9, 10 (2005); see also Mendoza v. Carey, 449 F.3d 1065, 1070 (9th Cir. 2006).

3   The state court's decision rejecting this claim therefore was not contrary to, or an unreasonable

4   application of, clearly established federal law under 28 U.S.C. § 2254(d).

5            Even assuming arguendo that Mr. Penilton's claim in this regard were cognizable

6   in a federal habeas corpus action, he has failed to show that his constitutional rights have been

7   violated by a lack of access to the law library.  It is well-settled that "[p]risoners have a

8   constitutional right of access to the courts guaranteed by the Fourteenth Amendment."  Bounds

9   v. Smith, 430 U.S. 817, 821 (1977)).  However, an inmate alleging a violation of Bounds must

10  demonstrate an actual injury to court access, defined as a specific "instance in which an inmate

11  was actually denied access to the courts."  Sands v. Lewis, 886 F.2d 1166, 1171 (9th Cir. 1989),

12  (quoting Kershner v. Mazurkiewicz, 670 F.2d 440, 444 (3rd Cir. 1982)).  See also Lewis v.

13  Casey, 518 U.S. 343, 351-52 (1996).  To demonstrate "actual injury," petitioner must show that

14  he "could not present a claim to the courts because of the state's failure to fulfill its constitutional

15  obligations."  Allen v. Sakai, 48 F.3d 1082, 1091 (9th Cir. 1995).

16           Mr. Penilton has failed to demonstrate that he was unable to present a specific

17  claim or defense at trial or that he has been unable to raise a specific claim in this petition

18  because of a lack of law library access.  Mr. Penilton is therefore not entitled to relief on this

19  claim.

20       G.     Failure to Grant a Continuance

21              1)      Description of Claim

22           Mr. Penilton claims that the trial judge refused to grant his request for a two week

23  continuance, thereby violating his right to due process.  Petition at 56.  He argues that this

24  request was necessary because he was not ready to proceed due to "officer misconduct."  Id.

25  /////

26                                                    18

1          2)      Applicable Law

2          The matter of whether to grant a continuance is traditionally within the discretion

3   of the trial judge.  Avery v. Alabama, 308 U.S. 444, 446 (1940); Grotto v. Herbert, 316 F.3d 198,

4   206 (2nd Cir. 2003).  There are no specific tests for deciding when a denial of a continuance is

5   so arbitrary as to violate due process.  Ungar v. Sarafite, 376 U.S. 575, 589 (1964);  Grotto, 316

6   F.3d at 206.  "The answer must be found in the circumstances present in every case, particularly

7   in the reasons presented to the trial judge at the time the request is denied."  Ungar, 376 U.S. at

8   589.  Thus, under some circumstances a denial of a request for more time may not violate due

9   process "even if the party fails to offer evidence or is compelled to defend without counsel."  Id.

10  See also Morris v. Slappy, 461 U.S. 1, 11-12 (1983) (recognizing the broad discretion granted to

11  trial courts on such matters and finding no Sixth Amendment violation based upon the denial of

12  a continuance).

13         On direct appeal from a federal criminal conviction, the Ninth Circuit Court of

14  Appeals balances four factors in determining whether a trial court was unreasonable in denying a

15  motion to continue: (1) the appellant's diligence in preparing his case; (2) the likelihood that the

16  continuance would serve a useful purpose; (3) whether the continuance would inconvenience the

17  parties, the court, or other witnesses; and (4) whether the appellant was prejudiced by the district

18  court's refusal to grant the request for a continuance.  United States v. Rivera-Guerrero, 426 F.3d

19  1130, 1138-39 (9th Cir. 2005); see also United States v. Flynt, 756 F.2d 1352, 1359 (9th Cir.

20  1985).  While none of the first three factors is ordinarily dispositive, the defendant must always

21  establish prejudice stemming from the denial of the continuance to be entitled to relief.  Rivera-

22  Guerrero, 426 F.3d at 1139; Martel v. County of Los Angeles, 56 F.3d 993, 995 (9th Cir. 1995)

23  (en banc) (a conviction will not be reversed for failure to grant a continuance unless the federal

24

25

26

appellant can show that he suffered actual and substantial prejudice).[6]  When a continuance is sought to obtain witnesses, "the accused must show who they are, what their testimony will be, that the testimony will be competent and relevant, that the witnesses can probably be obtained if the continuance is granted, and due diligence has been used to obtain their attendance on the day set for trial." United States v. Hoyos, 573 F.2d 1111, 1114 (9th Cir. 1978) (quoting Leino v. United States, 338 F.2d 154, 156 (10th Cir. 1964)).  Additionally, "[w]hen a motion for a continuance arguably implicates a defendant's Sixth Amendment right to counsel, the court must consider the effect of its decision on this fundamental right." United States v. Garrett, 179 F.3d 1143, 1147 (9th Cir. 1999) (en banc).

3)    Discussion

After Mr. Penilton made his request for a continuance on October 1, 2003 the following exchange occurred:

> MS. BIAFORE [prosecutor]: This was the date requested by the defendant for trial.  The people scrambled to be ready in time for the date requested by the defendant and this is a victim sensitive case.  There is (sic) about 25 witnesses that vary from law enforcement to doctors to civilians who are all ready as of today's date to go.
>
> . . . .
>
> MS. BIAFORE: Your Honor, the trial dates were set on August 8th.
>
> THE CLERK: I do have that.
>
> THE COURT: August 8th.  So we don't have the Faretta advisement here, do we?
>
> MS. BIAFORE: He was first read Faretta when he was arraigned in July, and he was reread Faretta on August 8th.

---

[6]  In the context of a collateral challenge to a state court conviction, this court is not required to apply this same test.  Nonetheless, the criteria identified by the Ninth Circuit in reviewing federal convictions on appeal is useful in analyzing the constitutional claim posed here.

1    THE COURT: He was advised on the specific provision that substitution of the appointment of counsel would be compromised
2    if he waited too long.

3    THE DEFENDANT: There were.  They were.  I just quit, that's all.

4

5    MS. BIAFORE: It's my understanding that <u>Faretta</u> was read slowly to the defendant on August 8th.  I was present, but I don't recall specifics.

6

7    THE COURT: I just need to know what the content was.

8    THE DEFENDANT: Listen, everything was by the book, there was no problem with that.  I'm just not ready.  That's the whole problem.

9

10   THE COURT: I'm not going to grant a continuance because you're not ready.

11   THE DEFENDANT: I'm happy just to get on with this.

12   RT at 24-25.

13         The trial court's refusal to grant a continuance appears based, at least in part, on

14   Mr. Penilton's failure to diligently prepare his case as well as the inconvenience to the

15   prosecutor, the court and the witnesses.  Further Mr. Penilton has not made any showing of

16   prejudice caused by the denial of the continuance.  Mr. Penilton has therefore failed to establish

17   prejudice and is not entitled to relief on this claim.

18         H.    <u>Destruction of Evidence</u>

19               1)    <u>Description of Claim</u>

20         Mr. Penilton claims the trial court violated his right to have the victim's rap sheet

21   placed under seal for appellate review.  Petition at 58.  He argues this error was  "intentional, not

22   harmless and not to mention criminal" and in violation of California Penal Code § 1054.7.  <u>Id.</u>

23               2)    <u>Applicable Law And Discussion</u>

24         With respect to Mr. Penilton's claim of a violation of California state law, such a

25   claim is not cognizable in this federal habeas corpus proceeding.  <u>See</u> <u>Estelle v. McGuire</u>, 502

26                                   21

1  U.S. 62, 67 (1991).  The conclusion of the state courts is final and unreviewable.  Id.  Aside from

2  a violation of California state law, Mr. Penilton has not identified a specific federal law

3  applicable to his claim.

4         To the extent Mr. Penilton is arguing the trial court violated his federal right to

5  exculpatory evidence pursuant to Brady, there is no violation of Brady or suppression by the

6  government where a defendant has sufficient information to obtain the information himself.  U.S.

7  v. Bracy, 67 F.3d 1421, 1429 (9th Cir. 1995) ("When, as here, a defendant has enough

8  information to be able to ascertain the supposed Brady material on his own, there is no

9  suppression by the government.") (quoting U.S. v. Aichele, 941 F.2d 761, 764 (9th Cir.1991);

10 see also Moore v. Illinois, 408 U.S. 786, 794 (1972) (listing suppression of evidence as one

11 element of a Brady claim); United States v. Dupuy, 760 F.2d 1492, 1501 n. 5 (9th Cir. 1985)

12 ("[S]uppression by the Government is a necessary element of a Brady claim.").  Mr. Penilton

13 possessed the victim's California rap sheet along with every a.k.a. the victim used in Nevada.

14 RT at 98.  With this information Mr. Penilton's appointed investigator could obtain the victim's

15 Nevada rap sheet for his use on appeal.[7]

16         To the extent Mr. Penilton is arguing that the court's refusal to place this

17 information under seal resulted in prejudice to his defense, "[w]hen a defendant has the

18 opportunity to present impeaching evidence to the jury . . . there is no prejudice in the

19 preparation of his defense."  Aichele, 941 F.2d at 764.  At trial Mr. Penilton impeached the

20 witness with matters arguably outside the scope of "moral turpitude," some of which the trial

21 court had previously excluded.  RT at 216-18.  Mr. Penilton presented the applicable impeaching

22 evidence to the jury and the court's refusal did not prejudice the preparation of his trial defense.

23         Additionally Mr. Penilton's argument concerning the importance of the "rap

24 _____

25      [7] Mr. Penilton's appointed investigator obtained the victim's California "rap sheet."  RT
   at 94.

26                                  22

sheet" and the need to place the document under seal were recorded in the trial transcripts for review by the California Court of Appeal.  There is therefore no prejudice to Mr. Penilton's appellate review.

Mr. Penilton has failed to demonstrate that the trial court violated any federal law or that he was prejudiced as a result of the court's action.  Mr. Penilton is therefore not entitled to relief on this claim.

I.      Jury Instruction Error

1)      Description of Claim

Mr. Penilton claims the trial judge incorrectly instructed the jury.  Petition at 59. Specifically, he argues that the trial judge should have instructed the jury that the crimes must have occurred on exact dates instead of "on an about" those dates  Id.

2)      Applicable Law

"[A] defendant is entitled to have the judge instruct the jury on his theory of defense, provided that it is supported by law and has some foundation in the evidence.  U.S. v. Crandall 525 F.3d 907, 911 (9th Cir. 2008) (quoting United States v. Fejes, 232 F.3d 696, 702 (9th Cir.2000)).  However, a state court's determination of whether a requested instruction is allowed under state law cannot form the basis for federal habeas relief.  Estelle, 502 U.S. at 67-68; see also Menendez v. Terhune 422 F.3d 1012, 1029 (9th Cir. 2005).  Nevertheless a "claim of error based upon a right not specifically guaranteed by the Constitution may nonetheless form a ground for federal habeas corpus relief where its impact so infects the entire trial that the resulting conviction violates the defendant's right to due process."  Hines v. Enomoto, 658 F.2d 667, 672 (9th Cir. 1981) (citing Quigg v. Crist, 616 F.2d 1107 (9th Cir. 1980));  See also Prantil v. California, 843 F.2d 314, 317 (9th Cir. 1988) (To prevail on such a claim petitioner must demonstrate that an erroneous instruction "so infected the entire trial that the resulting conviction violates due process.")  The analysis for determining whether a trial is "so infected with

unfairness" as to rise to the level of a due process violation is similar to the analysis used in

determining, under <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 623 (1993), whether an error had "a

substantial and injurious effect" on the outcome.  <u>See</u> <u>Thomas v. Hubbard</u>, 273 F.3d 1164, 1179

(9th Cir. 2001), <u>overruled on other grounds by</u> <u>Payton v. Woodford</u>, 299 F.3d 815, 828 n.11 (9th

Cir. 2002).  Where, as here, the challenge is a failure to give an instruction, the petitioner's

burden is "especially heavy," because "[a]n omission, or an incomplete instruction is less likely

to be prejudicial than a misstatement of the law."  <u>Henderson v. Kibbe</u>, 431 U.S. 145, 155

(1977).  <u>See</u> <u>also</u> <u>Villafuerte v. Stewart</u>, 111 F.3d 616, 624 (9th Cir. 1997).

                    3)          <u>Discussion</u>

          Mr. Penilton asked the trial judge to instruct the jury that the crimes alleged

occurred on specific dates because "[y]ou can't just vary; you just can't be vague about" the

dates.  RT at 542.  In objecting to Mr. Penilton's claim the prosecutor noted that California case

law allowed for some range in the alleged dates and that is why the information charging Mr.

Penilton used the phrase "on or about."  <u>Id.</u> at 543.

          In making this claim, Mr. Penilton has failed to demonstrate that the use of "on or

about" is a violation of established federal law.  He does not claim that he was not aware of the

time frame at issue, that the range of time was so great as to prohibit a defense, that the use of the

phrase was a violation of due process or that he was in any way prejudiced.  While Mr. Penilton

would have preferred that the allegations be limited to precise dates, that does not mean that his

trial was "so infected with unfairness" as to rise to the level of a due process violation.  Mr.

Penilton is therefore not entitled to relief on this claim.

/////

/////

J.    Ineffective Assistance of Appellate Counsel[8]

1)    Description of Claim

Mr. Penilton claims that he received ineffective assistance of appellate counsel. Petition at 62-70.  He argues that his appellate counsel refused to raise various issues on appeal, filed a "false brief," and failed to raise the fact that the prosecution filed a "fabricated probation report."  Id. at 62-73.

2)    Applicable Law

The Sixth Amendment guarantees the effective assistance of counsel.  The United States Supreme Court set forth the test for demonstrating ineffective assistance of counsel in Strickland v. Washington, 466 U.S. 668 (1984).  To support a claim of ineffective assistance of counsel, a petitioner must first show that, considering all the circumstances, counsel's performance fell below an objective standard of reasonableness.  Id. at  687-88.  After a petitioner identifies the acts or omissions that are alleged not to have been the result of reasonable professional judgment, the court must determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally, competent assistance.  Id. at 690; Wiggins v. Smith, 539 U.S. 510, 521 (2003).  In assessing an ineffective assistance of counsel claim "[t]here is a strong presumption that counsel's performance falls within the 'wide range of professional assistance.'"  Kimmelman v. Morrison, 477 U.S. 365, 381 (1986) (quoting Strickland, 466 U.S. at 689).  There is in addition a strong presumption that counsel "exercised acceptable professional judgment in all significant decisions made."  Hughes v. Borg, 898 F.2d 695, 702 (9th Cir. 1990) (citing Strickland, 466 U.S. at 689).

Second, a petitioner must establish that he was prejudiced by counsel's deficient performance.  Strickland, 466 U.S. at 693-94.  Prejudice is found where "there is a reasonable

---

[8] Mr. Penilton's claims 16-19 and 21 are nearly identical and will therefore be combined into one claim.

1   probability that, but for counsel's unprofessional errors, the result of the proceeding would have

2   been different." Id. at 694.  A reasonable probability is "a probability sufficient to undermine

3   confidence in the outcome." Id. See also Williams, 529 U.S. at 391-92; Laboa v. Calderon, 224

4   F.3d 972, 981 (9th Cir. 2000).  A reviewing court "need not determine whether counsel's

5   performance was deficient before examining the prejudice suffered by the defendant as a result

6   of the alleged deficiencies . . . .  If it is easier to dispose of an ineffectiveness claim on the

7   ground of lack of sufficient prejudice . . . that course should be followed." Pizzuto v. Arave, 280

8   F.3d 949, 955 (9th Cir. 2002) (quoting Strickland, 466 U.S. at 697).

9            The Strickland standards apply to appellate counsel as well as trial counsel.

10  Smith v. Murray, 477 U.S. 527, 535-36 (1986); Miller v. Keeney, 882 F.2d 1428, 1433 (9th Cir.

11  1989).  However, an indigent defendant "does not have a constitutional right to compel

12  appointed counsel to press nonfrivolous points requested by the client, if counsel, as a matter of

13  professional judgment, decides not to present those points." Jones v. Barnes, 463 U.S. 745, 751

14  (1983).  Counsel "must be allowed to decide what issues are to be pressed." Id.  Otherwise, the

15  ability of counsel to present the client's case in accord with counsel's professional evaluation

16  would be "seriously undermined." Id.  See also Smith v. Stewart, 140 F.3d 1263, 1274 n.4 (9th

17  Cir. 1998) (counsel not required to file "kitchen-sink briefs" because it "is not necessary, and is

18  not even particularly good appellate advocacy.")  There is, of course, no obligation to raise

19  meritless arguments on a client's behalf.  See Strickland, 466 U.S. at 687-88 (requiring a

20  showing of deficient performance as well as prejudice).  Thus, counsel is not deficient for failing

21  to raise a weak issue.  See Miller, 882 F.2d at 1434.  In order to demonstrate prejudice in this

22  context, petitioner must show that, but for appellate counsel's errors, he probably would have

23  prevailed on appeal. Id. at 1434 n.9.

24            3)        Discussion

25            Mr. Penilton argues that the claims his appellate counsel failed to raise were

26

                                         26

"undisputed" and "caused severe prejudice" to his appeal.  Petition at 64-65.  These claims

include the claims of prosecutorial misconduct, officer misconduct, fabrication of evidence,

destruction of evidence, and the other claims presented in this petition.  While Mr. Penilton

argues these claims are "undisputed," review of the record has not found evidence to support

them and his appellate counsel therefore had no duty to raise them.

        While Mr. Penilton argues that it was his "right to have all these issues argued,"

that is not true.  See Barnes, 463 U.S. at 751. (an indigent defendant "does not have a

constitutional right to compel appointed counsel to press nonfrivolous points requested by the

client, if counsel, as a matter of professional judgment, decides not to present those points.")

        Finally, even if these claims had been raised on appeal, Mr. Penilton has not

shown that it is probable he would have prevailed on these claims beyond his assertion that these

claims were "undisputed."  Mr. Penilton therefore has not demonstrated that he was prejudiced

by his counsel's refusal to raise these claims, and is therefore not entitled to relief on this claim.

        K.      False Probation Report

                1)      Description of Claim

        Mr. Penilton claims that the prosecutor made false statements in the probation

report.  Petition at 72.  Mr. Penilton argues the probation report claims he made a threatening

statement concerning the victim and claims he made "threatening hand gestures to the victim

while she was testifying."  Id.  Mr. Penilton argues that his sentence was based on the probation

report containing these inaccuracies and therefore asks to be re-sentenced.  Id.

                2)      State Court Opinion

        In rejecting this claim, the Sacramento County Superior Court stated:

        Petitioner's second claim is that the probation report used at
        sentencing contained two false statements: that petitioner during
        closing arguments stated has was "f—ing mad and would f—ing
        kill her [the victim] if he ever saw her again," and that the
        prosecutor had said that petitioner made threatening hand gestures

27

to the victim while she was testifying.  He also claims that appellate counsel was ineffective in failing to raise the claim on appeal.

At sentencing, petitioner stated that there were "a lot of issues in [the] probation report that shouldn't even be in there," but did not articulate any specific objection to a specific statement in the probation report.

A claim is procedurally bared on state habeas corpus when the claim was not raised at the trial court level (In re Seaton (2004) 34 Cal.4th 193).  The only exceptions to this procedural bar are: (1) if the claim is now couched in ineffective assistance of counsel terms; (2) petitioner did not know and could not reasonably have discovered the facts supporting the claim at the time of trial, and the later-discovered facts are essential to the claim (Seaton, supra); or (3) if the claim is that the sentence is unlawful, as an unlawful sentence may be corrected at any time (People v. Welch (1993) 5 Cal.4th 228).  Petitioner, who self-represented at the sentencing hearing, does not show that this claim qualifies for any of these exceptions.

Even if the claim were not barred, it would fail.  The probation report states that the prosecutor told the probation officer, over the telephone, that petitioner had made threatening hand gestures toward the victim while she was testifying, and petitioner does not attach any reasonably available documentary evidence to show either that the prosecutor made no such statement to the probation officer over the telephone, or that it was not true.

Petitioner is correct that he did not state during closing argument that he was "f—ing mad and would f—ing kill her [the victim] if he ever saw her again."  However, the probation report states in one sentence that petitioner during closing arguments had used foul language and expressed open hostility towards the victim (sic) all involved, and in a sentence that follows that petitioner "stated in open court" that he was "f—ing mad and would f—ing kill her [the victim] if he ever saw her again."  Petitioner does not attach a complete copy of reporter's transcript from every court appearance that he made, thus does not establish that at no point in time did he make the statement "in open court."

Regardless, petitioner fails to show that had either or both statements been objected to and ordered stricken from the report, that it would have been reasonably likely to have made a difference in the outcome of sentencing.  In imposing the upper term in sentencing petitioner, the trial court relied on the nature of the offenses and how they were committed, as well as petitioner's prior criminal record and the fact that he was on active parole

1   when the crimes were committed; the statements in question, if
    omitted from the probation report, simply would have made no
2   difference in this sentencing choice.

3   Answer, Ex. 11 at 2-3.

4          3)        Discussion

5          Respondent cold not identify a citation from the Reporter's Transcripts for the

6   threatening statement attributed to Mr. Penilton.  It appears therefore that he may not have made

7   that statement.  Nevertheless, during his closing arguments, Mr. Penilton stated:

8          If I was worried about killing Jameala [the victim], Jameala not
           coming to court, I would have did it.  That's the bottom line.
9          Don't' think, oh is he capable?  I'm capable of doing it.

10  RT at 568.  He went on to state that the victim had a history of "acting like an ass in public,"

11  referred to her as a "schizophrenic bitch," said "f–k Jamaela," and said about his relationship

12  with the victim coming to an end, "[n]ow f–k you, bitch.  I ain't got to deal with your punk sorry

13  ass no more."  RT 568-78.

14         Regardless of the statements Mr. Penilton did or did not make the record does not

15  indicate any such statements effected the trial court's determination of his sentence.  While the

16  trial judge did follow the Probation Report's recommended sentence, the calculation of Mr.

17  Penilton's sentence does not appear to have anything to do with any statement.  RT at 711-16.

18         Finally, Mr. Penilton has failed to show that the Superior Court's decision was

19  based on an unreasonable determination of the facts or was contrary to or involved an

20  unreasonable application of clearly established federal law.  Mr. Penilton is therefore not entitled

21  to relief on this claim.

22  VI.   CONCLUSION

23         Accordingly, IT IS HEREBY RECOMMENDED that petitioner's petition for a

24  writ of habeas corpus be denied.

25         These findings and recommendations are submitted to the United States District

26                                    29

Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections shall be served and filed within ten days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

DATED: February 26, 2009

CHARLENE H. SORRENTINO
UNITED STATES MAGISTRATE JUDGE